**GERALD M. and Maureen M., individually and as next friend of their minor children J. and M., Plaintiffs–Appellants,**

v.

**J. CONNEELY and Village of Dolton, Defendants–Appellees.**

No. 87–1934.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1988.

Decided Oct. 3, 1988.

Elizabeth Dale, Chicago, Ill., for plaintiffs-appellants.

Henry E. Mueller, Ancel Glink Diamond Murphy & Cope, P.C., Chicago, Ill., for defendants-appellees.

Before WOOD, Jr. and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This case began as a neighborhood fuss between youngsters, but subsequently involved their parents and a police officer. The Maceks and the Urbans are neighbors who do not get along. Ten-year-old Jay and eight-year-old Mark Macek punched ten-year-old Todd Urban in the face and threw his bike over a fence into a backyard. The Urbans complained, and Officer Conneely visted the Macek house. He entered the home to talk to the Macek boys, and when Mrs. Macek resisted, and neighbors began to gather outside, he took the boys to the Dolton Police Station. The boys spent approximately thirty to forty minutes in an interview room at the station without their parents, subsequently joined their parents for several meetings with a juvenile officer and the Urbans, and returned home, all within two hours from the time the boys left with Conneely. The Maceks would like us to believe that there was no probable cause to detain the boys, Conneely improperly entered the Macek home, and the boys were improperly separated from their parents, all in violation of the Constitution. Thus they sought compensation from the city of Dolton[1] and Officer Conneely under 42 U.S.C. § 1983.[2] Holding that the Constitution had not been violated, the district court granted the defendants' motion for summary judgment. We affirm.

## I. BACKGROUND

On September 26, 1983, Jay and Mark Macek came upon Todd Urban in an alley

---

1. Because we hold that the Maceks have offered insufficient evidence to support their allegations under 42 U.S.C. § 1983 we need not consider whether Dolton, as a municipality, would otherwise escape liability under the holding of *Monell v. Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

2. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

of their Dolton, Illinois neighborhood. Jay and Mark threw Todd off his bicycle, apparently punched him in the face, and threw the bicycle over a fence and left it there. Jay and Mark returned home and told their mother, Maureen Macek, about their confrontation with Todd Urban. Mrs. Macek instructed the boys to stay in the house, and Jay and Mark went into the basement.

In the meantime Todd Urban reported to his father that Jay and Mark had stolen his bicycle. Todd's father notified the police of the theft. Defendant Conneely, a Dolton police officer, responded to the call and arrived at the Urbans' home at approximately 5:30 p.m. Before arriving at the Urban home Conneely unsuccessfully toured the area, searching for the Macek boys and the bike.

After speaking with Todd Urban, with his father present, Conneely then proceeded to the Macek home, which was about six houses south of the Urban home. Upon arriving at the Macek house, Conneely spoke to Mrs. Macek and explained that he needed to speak to her sons about the theft of the Urban boy's bicycle and the striking of Todd Urban. Mrs. Macek denied that her sons were involved. She asked Officer Conneely to wait, she says, at the porch or front door, and she went into the house to call Jay and Mark up from the basement. As she turned, she realized that Officer Conneely had stepped into the house and was only a few feet from where she was standing in the kitchen. Mrs. Macek warned Conneely to be careful of the dog she had in the kitchen.

Once the boys were upstairs Conneely had a brief interview with Jay and Mark in the living room. After that, Conneely took Jay and Mark outside so Todd Urban could positively identify them. Jay and Mark accompanied Conneely in the police car to where the boys said they had left the bicycle. They recovered the bicycle and returned to the Macek house where a disturbance among various people in the street was developing. The Urbans were present to recover the bicycle.

Allegedly afraid for the children's safety, Conneely put Jay and Mark in his police car and drove them to the Dolton Police Station. At the station Conneely took the children to one of the interview rooms to fill out a juvenile contact sheet, a form asking for personal data such as the boys' names and address.

Mr. and Mrs. Macek arrived shortly thereafter and requested to see their children. Their request was denied, and they were not allowed to see the boys until a juvenile officer spoke with them. Apparently Mr. Macek vehemently expressed his displeasure regarding the separation from his children and was told by Conneely he would be arrested if he did not quiet down. A neighbor of the Maceks, attorney Jim Whitney, was also denied access to the children.

Eventually Juvenile Officer Thomsen met with the Maceks and with the Urbans separately and then with the families together. Thomsen explained to the Maceks that the boys were not going to be charged with a crime unless the Urbans were to call back later that week to press charges, which they did not do. The Maceks left the station with their children and went home.

## II. DISCUSSION

### Standard of Review

Rule 56 of the Federal Rules of Civil Procedure sets forth the standard applied to motions for summary judgment. "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Although any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party, only reasonable inferences will be considered." *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984).

### Probable Cause—Jury Question

■ The Maceks claim that the district court incorrectly decided that the "uncor-

roborated complaint of a ten year old boy that his bicycle had been stolen by another ten year old boy and his eight year old brother was sufficient as a matter of law to authorize the custodial arrest of the two boys." Citing *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir.1985) (*en banc*), the Maceks claim that a jury was entitled to find that this did not establish probable cause and therefore the activities were unreasonable. The Maceks offer two reasons supporting their claim. The first is that the statement of a ten-year-old, here it is Todd Urban but their rule seems to apply to any ten-year-old, is per se unbelievable and insufficient to support probable cause. The second is that in a case involving a bicycle and a ten-year-old victim-witness the police must conduct a thorough investigation before detaining or arresting a suspect.

Indeed *Llaguno* does state that when the issue of probable cause "arises in a damage suit, it is ... a proper issue for the jury if there is room for a difference of opinion." *Id.* at 1565. "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). "When an officer has 'received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth,' *Daniels v. United States*, 393 F.2d 359, 361 (D.C.Cir.1968), he has probable cause." *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987).

The Maceks offer absolutely nothing that suggests to us that it was unreasonable for an officer to believe Todd Urban's statements. Yes, Todd is ten years old, but without more, what would allow us to reasonably infer that Conneely should have found his story not worthy of belief? Ten-year-olds are capable of being more truthful than some adults. Certainly there exists a general animosity between the families, but once more we are not told how this may have made Todd's statement to a police officer unbelievable. We are not unaware that a person who dislikes another

has a motive to lie to the detriment of that person, but motive without at least a shred of evidence suggesting that the motive was acted on does not taint a statement. We are left to dream up reasons why Conneely's decision regarding probable cause was in error, and this is an exercise suited for advocates, not judges. What is firmly rooted in the record is that Conneely was aware of no information, and indeed there was none, from which he could believe that Todd was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.

Even against this backdrop the Maceks still believe that Conneely should have done more to ferret out further details regarding Jay and Mark's involvement. Despite the Maceks arguments to the contrary, the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage, even if ideally that might appear to be a more desirable approach. *Gramenos*, 797 F.2d at 441–42. In any event, here Conneely did attempt to make further inquiry before affecting any arrests, but it seems he was hampered by the activities of Maureen Macek and the residents of the neighborhood. The neighbors were aroused by the neighborhood conflict; nothing suggests that their anger was directed toward the police. Conneely decided that the most prudent route was to remove the children to the police station where matters could more calmly be resolved. This is not a speculative conclusion; in support of another argument the Maceks stated that Conneely made the arrest only because of Mrs. Macek's uncooperativeness. The Maceks offered this to show that Conneely was not motivated by a belief that there was probable cause to arrest the Macek boys, but by an intent to retaliate against Mrs. Macek. This offers the Maceks no solace. If probable cause exists, an arrest is not tainted because a police officer may dislike one of the actors in the underlying dispute, unless this is shown to be an important factor in the decision. The Maceks have offered nothing but mere speculation on this point.

Moreover, Conneely's actions were consistent with the procedure set out in Illinois statutory law, Ill.Ann.Stat. ch. 37 §§ 702–1, 703–1 (Smith–Hurd 1972) (current versions at Ill.Ann.Stat. ch. 37 ¶¶ 802–1, 802–5, 803–1, 804–1, 804–4, 805–1, 805–5 (Smith–Hurd Supp.1988)), which allows an officer to make a warrantless temporary detention of a minor who he believes is a delinquent. Illinois defines delinquent as a child who has not yet reached seventeen years of age and who has violated federal, state, or municipal law. Here it appeared that the Macek children may have been involved in battery, theft, or criminal damage to property.

Accordingly, there can be no difference of opinion: a prudent officer would believe that the facts and circumstances showed that there was probable cause to believe that the Macek boys had committed a crime or juvenile offense. Therefore the district court properly decided the issue.

*Separation*

The Maceks argue that the facts here fall short of that which the court in *Bergren v. City of Milwaukee*, 811 F.2d 1139 (7th Cir.1987), found sufficient to justify police detention of children without their parents under a *parens patriae* theory. Only a "powerful countervailing interest," *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), will justify a separation, argue the Maceks. They list several reasons that they believe legitimately support the separation of a child from his or her parents: protecting the juvenile and society from the risk of juvenile crime, preserving the relationship with another parent, preserving the child's health, or investigating a serious crime. The Maceks believe none of these are present in this case.

In *Bergren* an eleven-year-old child, Michael Bergren, was taken into custody by police for allegedly inflicting critical injuries to Kelly Tompkins, a two-year-old child he had been babysitting. The police took Michael into custody at approximately 2:00–2:30 p.m. from the hospital where doctors were treating Kelly. (At the request of the police Michael's mother asked Michael to come to the hospital, where she had earlier joined Kelly's parents to await word on Kelly's condition.) Police transported Michael to a downtown Milwaukee police station and did not allow Mrs. Bergren to ride with Michael. Mrs. Bergren attempted to find another ride so she could follow the police car to the station, but the officers refused to wait. They told her that they would probably end up at one of two locations, which one they were not exactly sure. Detectives questioned Michael for forty-five minutes, and after allegedly waiving his right to counsel, he described how Kelly had been injured. At the conclusion of the questioning Michael was placed in a juvenile section of the jail until 6:20 a.m., about a fifty-four minute lock-up. He was then handcuffed and taken to the juvenile detention center. An intake worker at the juvenile center interviewed Michael, and he was released at approximately noon. *Bergren*, 811 F.2d at 1140–41.

The *Bergren* court analyzed the propriety of Michael's confinement under the Due Process Clause of the fourteenth amendment and under the right of association of the first and fourteenth amendments.

Pre-trial detention of a juvenile does not violate the due process clause provided that: 1) the state does not subject a juvenile to restrictions and conditions of confinement amounting to punishment and 2) the period of detention is not excessive in relation to the state's interest in protecting both the community and the juvenile from the consequences of future criminal conduct.

*Id.* at 1143 (citing *Schall v. Martin*, 467 U.S. 253, 269, 104 S.Ct. 2403, 2412–13, 81 L.Ed.2d 207 (1984)). The court also noted that in *Gramenos v. Jewel Cos.*, 797 F.2d 432, 437 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1952, 95 L.Ed.2d (1987), this circuit required an explanation in the record for the detention of an adult on a misdemeanor charge for four hours. *Bergren*, 811 F.2d at 1143. *Bergren* found that the record sufficiently explained the lengthy detention. The officers believed that Michael had committed a violent crime

and that he might pose a danger to himself. The officers questioned him for forty-five minutes, detained him in a cell for fifty-four minutes, and as soon as it was practicable transported him to the juvenile center for the requisite processing and release. He had been neither physically or psychologically abused nor detained for an excessive period of time; therefore, due process had not been violated. *Id.* at 1144.

*Bergren* applied similar reasoning to find that the parent-child relationship had not been interfered with to such an extent that it violated the associational rights of either Michael or his parents, emphasizing that "acting in its role as *parens patriae,* [the state] may take a minor into custody when it has probable cause to believe the minor has committed a crime. *Id.* In a footnote pointed to by the Maceks, *id.* at 1144–45 n. 6, which was not the basis of the *Bergren* holding, the court noted that its holding was limited to the circumstances of that case and that there might be a situation where interference with the parent-child relationship resulted in serious constitutional consequences. The cases cited in the footnote, *In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967) and *United States v. White Bear,* 668 F.2d 409, 412–13 (8th Cir.1982), suggest that the *Bergren* court was foreseeing situations where interference with the relationship may have affected rights such as the right against self-incrimination. The finding of such a grave constitutional implication is not a necessary prerequisite to a holding that an interference with the right to association exceeded the bounds of the fourteenth amendment.

■■■ The Macek children were taken to the police station where they were placed in an interview room and instructed to complete a "juvenile contact sheet." The contact sheet seems to be nothing more than a

questionnaire regarding vital statistics of the detainee. Apparently the person completing the form must list such things as name, phone number, and eye color. Information regarding the activity leading to the detention or any incriminating information is not requested. Likewise, officers did not question the boys regarding the bike incident nor did they in any manner interrogate the boys.[3] The Maceks stated that the boys may have been crying and an officer may have yelled at the boys while they were in the interview room, but this argument is not sufficiently developed by the Maceks for us to find that the actions were improper. Certainly any one, child or adult, detained at a police station, whether or not the detention is proper, will be fearful and may be sufficiently frightened and upset to cry. As for any yelling, at most it occurred twice, if at all, and accepting the Maceks' description it appeared brief and relatively minor. Without more, we cannot find that this equates with unconstitutional behavior. Furthermore, although it may have been stretching reason a bit to expect eight- and ten-year-old boys to accurately complete the questionnaire, nothing in the record suggests that this was punishment. There is nothing else about the minimal detention here that could amount to punishment.

The Maceks and the Urbans had an ongoing conflict. The bike episode heightened the conflict and produced a dangerous volatility in the neighborhood. Several residents of the neighborhood had gathered outside the Macek home. Mrs. Macek was uncooperative and confrontive, and it appeared that the situation might escalate beyond a mere disagreement among children. It seems that withdrawing to the police station where the situation could be resolved in a more controlled atmosphere was a prudent choice. At 5:41 p.m. the Macek children were taken to the police

---

**3.** The Maceks also claim that the refusal to let the Maceks' neighbor-attorney meet with the boys during the time they were separated from their parents violates the Constitution. In his role as neighbor Whitney stands in no better position than did the parents, and thus the argument fails. In whatever his role was as the boys' attorney the claim likewise fails because the boys were in custody but were not *interrogated, Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and alternatively, adversarial criminal proceedings had not yet been initiated so as to require the presence of an attorney, *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

station. Their father arrived at about 5:55 p.m., and apparently their mother accompanied him. Extrapolating from Mr. Macek's estimates of the length of several meetings and the time he arrived back at his home, it appears that the Macek family was reunited at approximately 6:20–6:30. The longest the separation may have been then would appear to be from thirty-nine to forty-nine minutes. This certainly is a brief period.

Furthermore, Illinois statutory law was properly followed. The Illinois juvenile laws require that an officer taking a child into custody notify the parents of what he or she plans to do with the child, including where the child will be held. The officer must also promptly turn the minor over to a juvenile police officer. Ill.Ann.Stat. ch. 37 § 703–2 (Smith–Hurd 1972) (current version at Ill.Ann.Stat. ch. 37 ¶¶ 802–6, 803–8, 804–5, 805–6 (Smith–Hurd Supp.1988)). Here, Mrs. Macek was told that the boys were under arrest and where they would be taken. Conneely turned the boys over to the juvenile police officer, Thomsen, shortly after arriving at the station. Thomsen met separately with the Urban family and with the Macek family and then with both families in one group. At the conclusion of the joint meeting the boys were released, no charges were filed, and they were home before 7:30 p.m.

These acts are well within the ambit of *Bergren,* which directs that we, as did the district court, find the detention of the Macek boys constitutional.

*Consent*

According to the Maceks, Conneely's entrance into the Macek home was "granted only in submission to a claim of lawful authority." She claims that she did not voluntarily consent to Conneely's entrance into the house. Mrs. Macek states that when the officer came to the door and asked to speak to her sons, she agreed to call them up from the basement, but she instructed Officer Conneely to "wait here." As she went to get the boys, Conneely stepped inside the door and proceeded down the entrance hallway. Mrs. Macek entered the kitchen, where the door leading to the basement was located. Besides Mrs. Macek's warning to be careful of the dog, she said nothing as Conneely followed her a distance of eighteen feet into the house (This is the Macek's estimate; Conneely claims he went no more than three feet into the home.). During the subsequent conversation in the living room between Conneely, Mrs. Macek, and the boys nothing was mentioned about Conneely's entrance into or continued presence in the house. Mrs. Macek stated in her deposition that she was surprised he entered the home but admitted that once he entered the home she did nothing to indicate to him that she disapproved.

"[V]oluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 249, 93 S.Ct. 2041, 2058–59, 2059, 36 L.Ed.2d 854 (1973) (footnote omitted). Therefore any assertion by Mrs. Macek that she did not understand that she could refuse entry to Conneely is not dispositive but is one factor to be considered because we must consider the "totality of all the surrounding circumstances" when deciding if Mrs. Macek's will was overborne. *Id.* at 226, 93 S.Ct. at 2047.

"[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2059. We will determine whether it was reasonable for Officer Conneely to believe that Mrs. Macek had voluntarily consented to his entry into her home. *See United States v. Griffin,* 530 F.2d 739, 743 (7th Cir.1976). The fact that Mrs. Macek said "wait here" or something similar gives us pause, but only for a moment. The material facts are undisputed. Her subsequent silence and apparent acquiescence

persuades us that Conneely's presence in the home was not against Mrs. Macek's apparent wishes. Mrs. Macek was not coerced. She was in her own home and was confronted by a single police officer. (Another officer accompanied Conneely to the Macek home, but he did not enter the house.) Conneely did not threaten or intimidate her in any way. He merely stated that he wished to talk with the boys. Mrs. Macek did not verbally object to the entrance. She did not act astonished nor did she physically respond in any way that might relay the message she disapproved of his movement. She simply waited for her sons and warned Conneely of a puppy in the kitchen. Assuming this was a search or seizure under the fourth amendment we agree with the district court that the single assertion that Mrs. Macek was surprised that Conneely entered the home falls well short of demonstrating that under the totality of the circumstances her consent was not voluntary.

## III. CONCLUSION

Where law enforcement officers have probable cause to believe that a crime has been committed, and the criminal act and the ongoing neighborhood disagreements of which it is a part cannot be resolved with limited law enforcement intervention within the neighborhood, the officers may need to remove the dispute to the police station. And where probable cause exists the actors that have necessitated the removal cannot later complain that their constitutional rights have been trampled because of the resultant several hours spent at the station, a part of which time is spent separated from their children. The fact that, as a result of the removal, children who reasonably are suspected of criminal acts are separated from their parents for at most forty minutes does not change this outcome when the police quickly and appropriately deal with the children and the neighborhood conflict.

AFFIRMED.