NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0632n.06

No. 12-1576

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 05, 2013*
DEBORAH S. HUNT, Clerk

DWAYNE PROVIENCE,

    Plaintiff-Appellee,

v.

CITY OF DETROIT; DAVID MOORE,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:  GILMAN, ROGERS, and SUTTON, Circuit Judges.

ROGERS, Circuit Judge.  Dwayne Provience filed this action under 42 U.S.C. § 1983 and

Michigan law, claiming due process violations under *Brady v. Maryland*, 373 U.S. 83 (1963), false

arrest, and malicious prosecution against Detroit police Sergeant David Moore, and raising a

municipal-liability claim against the city of Detroit.  The district court denied the defendants' motion

for summary judgment, holding that Sergeant Moore was not entitled to qualified immunity or state-

law governmental immunity, and finding that Provience raised a genuine dispute of material fact as

to the city's municipal liability.  Defendants now appeal that decision.  They argue that Sergeant

Moore is entitled to qualified immunity because he did not violate Provience's due process rights

under *Brady*, and that Provience's arrest and prosecution were supported by probable cause.  The

district court properly denied summary judgment on the *Brady* claim, but erred in denying summary

judgment on the false-arrest claim and the malicious-prosecution claims under federal and state law.

On March 24, 2000, a man named Rene Hunter was murdered in Detroit, Michigan.

Witnesses indicated that the perpetrators were two black males who pulled up next to Hunter at the

corner of Greenfield Road and Pembroke Street in an older-model gray four-door Chevrolet Caprice

Classic. The passenger in that car fatally shot Hunter from inside the car, which then sped off down

a nearby side street. Hunter had been taken from the home of a friend, Courtney Irving, by men in

a white Cadillac, and dropped off at the corner where he was killed. Courtney Irving lived next door

to a gang of drug-dealers, run by Sorrell "Ready" Mosley and his nephew, Antrimone "Terry"

Mosley. Irving was himself murdered on April 24, 2000, purportedly because the Mosleys

discovered that Irving was preparing to inform the police that the Mosleys murdered Hunter for

stealing a large amount of marijuana from them. Witnesses at the Irving murder scene reported that

the perpetrators fired shots from inside a white Cadillac and a gray-colored vehicle into the

windshield of the vehicle that Irving was sitting in. The perpetrators then pulled Irving out of his

car, placed him in the Cadillac, drove to the corner of Pembroke Street and Fenmore Avenue,

dumped him there, and shot him several more times.

Sergeant David Moore of the Detroit Police Department was in charge of investigating the

Hunter murder. A progress note on the investigation noted that the Hunter and Irving murders were

connected and that a man named Maurice "Bangy" Sutherland had information about both murders.

The progress note reads:

> These t[w]o Homicide files are joined at the hip, because the two complainants were together when Rene [Hunter] got killed and Cour[t]ney [Irving] was going to tell who and why they killed Rene. Bangy has gotten a lwayer [sic] and wants to talk to us now (Attorney Blank 313-275-1551). He is going to come in on Monday at 11:00am, 5/15/00. Maurice Sutherland AKA Bangy has the info we need to close these cases. Mr. Sutherland is the key. He is the set up person on Rene Hunter's case.

R. 1-1 at 2. Sutherland met with investigators on May 15, 2000, but did not provide any information on the murders. Two weeks later, Sutherland was also murdered.

In June 2000, the police arrested Larry Wiley, a drug addict with a prior criminal record, for several burglaries. Wiley told the police that he had witnessed the Hunter murder, that Provience was the shooter, and that Provience's brother drove the getaway car. Wiley claimed that he had been riding his bicycle in the area and saw Provience and his brother in a beige or yellow Buick Regal when the victim, Hunter, jumped out of their car. Wiley told police, "I saw Dewayne [sic] shoot the guy in the head." Wiley claimed that Provience shot Hunter "[o]ver some drug money," and that "[e]verybody knew that they had a beef." However, contrary to what other witnesses had told police at the scene—that the car was a gray Chevrolet Caprice, that multiple shots were fired, and that the car turned right onto Greenfield and headed north—Wiley told investigators that the getaway car was a "beige or yellow [Buick] Regal," that only one shot was fired, and that the car fled "[d]own Pembroke [westbound] from Greenfield." Wiley was given a deal on his burglary charges in exchange for testifying against Provience.

Provience and his brother were arrested and prosecuted for Rene Hunter's murder. The progress note connecting the Hunter and Irving homicides was not turned over to Provience's counsel during discovery. Provience's brother was acquitted following a bench trial, but Provience

was convicted by a jury of second-degree murder in February 2001. The prosecution's theory of the case was that Provience murdered Hunter because Hunter posed a threat to Provience's drug territory. Wiley testified for the prosecution at Provience's trial, but Provience was not advised that Wiley had been given a deal in exchange for his testimony. Provience was sentenced to a prison term of thirty-two to sixty-two years.

In 2002, Eric Woods, a friend of the Mosleys, confessed to the murder of Courtney Irving. Woods told police that Terry Mosley directed him to kill Irving because Irving was going to tell the police that the Mosleys were responsible for the Hunter murder. Woods's confession was never disclosed to Provience's counsel, even though Provience's case was being appealed at the time. Provience exhausted his appeals in 2006. Law students at the University of Michigan Innocence Clinic began reviewing Provience's case in 2009. The students interviewed Eric Woods, who told them that his mother had a file regarding Woods's case. The Innocence Clinic reviewed that file and discovered the progress note connecting the Hunter and Irving murders. Wiley, the cooperating eyewitness at Provience's trial, thereafter recanted his statement that he witnessed Provience shooting Hunter. The Innocence Clinic filed motions for relief from judgment and for a new trial on Provience's behalf. On November 3, 2009, Judge Timothy Kenny granted the motion, vacating Provience's conviction and ordering a new trial. On March 24, 2010, the Wayne County Prosecutor's Office dismissed the murder charge against Provience.

Provience then filed this action in federal district court under 42 U.S.C. § 1983 and Michigan law. Provience argued that Sergeant Moore's failure to disclose the following material exculpatory

evidence violated Provience's due process rights under *Brady*: (1) the progress note, (2) a photo of Ready Mosley and field notes of police officer William Ashford, which were provided to Sergeant Moore's investigation team, (3) police documents from the Irving and Sutherland homicide files connecting the Hunter, Irving, and Sutherland homicides, and (4) "off the record" statements of Chris Peavey, a friend of Rene Hunter and Courtney Irving, who told investigators that Provience did not shoot Hunter. Provience also claimed that Sergeant Moore arrested him without probable cause and influenced the decision to prosecute by not turning over to prosecutors the exculpatory evidence cited above.

The defendants moved for summary judgment, arguing that Moore was entitled to qualified immunity and that the city of Detroit was not liable under a municipal-liability theory. The district court denied that motion. *Provience v. City of Detroit*, No. 10-11719, 2012 U.S. Dist. LEXIS 44978 (E.D. Mich. Mar. 31, 2012). On the qualified-immunity issue, the district court held that Provience raised a genuine issue of material fact as to whether Sergeant Moore violated *Brady* by not turning over the progress note, Peavey's statement, and the names of witnesses interviewed by police regarding the shooting. *Id.* at *14. The district court held that Provience also raised a genuine issue of material fact as to whether the information Sergeant Moore provided to form the basis of the arrest warrant[1] was false, *id.* at *16, and as to whether Sergeant Moore participated or influenced the decision to prosecute the case against Provience without probable cause, *id.* at *17. Finally, the

---

[1] Sergeant Moore stated that Judge B. Pennie Millender signed the arrest warrant for Dwayne Provience and his brother, on June 29, 2000. *See* Moore Depo., R. 78-1 at 17.

district court held that Provience raised a genuine issue of material fact as to the state-law claim for malicious prosecution under Michigan law. *Id.* at \*19.

This court has jurisdiction over the defendants' interlocutory appeal under 28 U.S.C. § 1291 because denial of summary judgment based on qualified immunity is an immediately appealable collateral order. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). Although Provience argues that this court lacks jurisdiction because the defendants have raised factual disputes, the mere fact that the defendants make an occasional factual argument does not destroy jurisdiction over the legal issue of qualified immunity, and this court may simply ignore the defendant's attempts to dispute Provience's version of the facts, obviating the need to dismiss the entire appeal for lack of jurisdiction. *Estate of Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008) (internal quotation marks omitted). This court reviews the denial of summary judgment *de novo*, viewing all factual evidence and drawing reasonable inferences in Provience's favor as nonmovant. *See Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir. 2009).

On this appeal, Sergeant Moore has not shown that he is entitled to qualified immunity on the *Brady* claim. Qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Brady*, 373 U.S. 83, 87 (1963), the Supreme Court held that a prosecutor's suppression of evidence favorable to the accused violates due process where the evidence is material and

exculpatory. We have, moreover, held that "the constitutional principles recognized in *Brady* apply just as equally to similar conduct on the part of police, and thus support our recognizing that the police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 378-79 (6th Cir. 2009). We read Sergeant Moore's argument on appeal to challenge whether the evidence in question is sufficiently material and exculpatory that its withholding could invalidate a criminal conviction. In rejecting that argument, as we do below, we take no position on the limits, debated in *Moldowan*, on police officer liability for not giving exculpatory evidence to prosecutors. *Id.* at 382-83, 387. While the majority in *Moldowan* rejected a bad-faith requirement, the majority nonetheless proceeded to find sufficient evidence of bad faith. *Id.* at 389. The concurrence read the majority's opinion as limiting the scope of the police officer's duty to "evidence whose materially exculpatory value was known to the particular officer sued," and indicated that this requirement was the "functional equivalent" of a bad faith requirement. *Id.* at 407 (Kethledge, J., concurring and dissenting). Provience's argument on appeal is not explicitly directed toward such an actual knowledge requirement, and our decision should not be taken as reflecting on the scope of that requirement or the extent to which that additional requirement has been shown in this case.

Contrary to defendants' argument, Provience has shown that the evidence at issue is favorable to him as exculpatory or impeaching, that the evidence was suppressed, and that he was prejudiced by the suppression. These are the requirements for a *Brady* violation sufficient to reverse

a conviction. *See Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

First, the progress note is material exculpatory evidence under *Brady* and its progeny because, considered collectively with the other evidence withheld during discovery, it is favorable to Provience and tends to establish his innocence. *Brady* defined material exculpatory evidence as evidence "favorable to an accused . . . [and] material either to guilt or to punishment." *Brady*, 373 U.S. at 87. The progress note falls within that category because it supports a viable alternative theory of the crime, highlighting the connections between the Mosleys, Hunter, Irving, and Sutherland. The note tends to show that the Hunter, Irving, and Sutherland homicides were related to the same drug-dealing enterprise. This evidence helps cast doubt on the prosecution's theory of the case—that Provience killed Rene Hunter over an isolated drug territory dispute.

Second, there is no dispute that the evidence was suppressed, because Sergeant Moore never turned the progress note over to the prosecutor. Third, Provience was likely prejudiced by the suppression because there is a reasonable probability that Provience's trial would have produced a different result if the progress note had been turned over. This court has noted that favorable evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). In determining reasonable probability, the question is whether, in the absence of the

suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

At trial, the prosecution's theory—that Provience killed Hunter in a dispute over drug territory—would likely have been undermined by the progress note. The note indicates that Irving was killed by someone who wanted to prevent Irving from offering information about Hunter's murder, suggesting that the person responsible for Irving's murder would also be implicated in Hunter's murder. The progress note might also have helped impeach Wiley, and because the case against Provience relied so heavily on Wiley's testimony, the note's suppression undermines the reliability of the verdict. Provience has raised a triable fact issue as to whether the progress note's suppression violated his constitutional rights under *Brady*. Moreover, defendants do not argue that, to the extent there may have been a *Brady* violation, the right at issue was not clearly established.

Whether the other evidence suppressed by the police—the photograph of Ready Mosley, field notes of Officer Ashford, the police documents from the Irving and Sutherland files, and the off-the-record statement of Chris Peavey—is material exculpatory evidence under *Brady* is less clear. Although this evidence is probably favorable to Provience, it is likely not material because it is cumulative of other evidence. Undisclosed evidence that is cumulative of other evidence does not support a *Brady* violation. *See United States v. Warshak*, 631 F.3d 266, 300-301 (6th Cir. 2010); *see also Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996) (indicating that the materiality question turns on the evidence's value relative to other evidence).

The photograph is probably nonmaterial because Ready Mosley's identity was never at issue, and it provides no additional information about Hunter's murder. There is no indication that Officer Ashford's field notes or the documents from the Irving and Sutherland police files contained any information not already brought out at trial. Finally, Chris Peavey's statement, which indicated that Provience was not the person who killed Rene Hunter, would only have added one more voice contradicting Larry Wiley's eyewitness account.

These additional bits of evidence are probably nonmaterial for *Brady* purposes. Moreover, this court has previously concluded that the evidence withheld from the defense must be viewed collectively, rather than item by item, to determine the cumulative prejudicial effect. *See Beuke v. Houk*, 537 F.3d 618, 634 (6th Cir. 2008); *Schledwitz v. United States*, 169 F.3d 1003, 1012 (6th Cir. 1999). Therefore, because the progress note was clearly material exculpatory evidence, we may conclude that Provience's rights were violated based on the note's suppression, without having to determine whether each additional suppressed item was also material exculpatory evidence.

On the false-arrest claim, Sergeant Moore is, however, entitled to qualified immunity because the police had probable cause to arrest Provience based on Wiley's eyewitness statement. Provience has not met his burden, which is to show that no reasonable officer would have concluded, under the totality of the circumstances, that probable cause to arrest existed. *See Parsons v. City of Pontiac*, 533 F.3d 492, 500-501 (6th Cir. 2008).

Probable cause, supported by "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the

circumstances shown, that the suspect has committed, is committing, or is about to commit an offense," bars a false-arrest claim under § 1983. *See Criss v. City of Kent*, 867 F.2d 259, 262-63 (6th Cir. 1988) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Because there were facts and circumstances within Sergeant Moore's knowledge, namely the eyewitness account of Larry Wiley, that were sufficient for him to reasonably suspect that Provience had committed the Hunter murder, Sergeant Moore had probable cause to seek a warrant for Provience's arrest. The dispositive fact is that the information forming the basis of the arrest warrant was sufficient for any reasonably prudent officer to believe that Provience had murdered Rene Hunter, even if that information later proved to be wrong.

Our precedent establishes that an investigating officer has probable cause to make an arrest based on an eyewitness account, "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation omitted). Although Larry Wiley's eyewitness account was inconsistent with other witness testimony, an eyewitness's statement does not need to be consistent with all other available evidence. *See id.* at 371. Even an admittedly "vague and inconsistent" account, *id.* at 368, can provide "ample probable cause," *id.* at 371; *see Skousen v. Brighton High Sch.*, 305 F.3d 520, 528 (6th Cir. 2002). Provience has not raised a genuine issue of material fact as to whether Sergeant Moore was reckless in relying on Wiley's eyewitness account—even if that account did not comport with every detail of other witnesses' statements.

- 11 -

Sergeant Moore was at most negligent, and this court has held that investigatory negligence "does not demonstrate knowing or intentional behavior designed to violate [plaintiff's] constitutional rights." *Ahlers*, 188 F.3d at 373-74.

In addition, Sergeant Moore's belief that probable cause existed was reasonable. Although an officer "cannot look only at the evidence of guilt while ignoring all exculpatory evidence," an officer does not "have [an obligation] to investigate independently every claim of innocence" and need only "consider the totality of the circumstances." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Sergeant Moore fulfilled his investigatory duties and reasonably concluded that probable cause existed. Although it may be tempting to look back in hindsight and second-guess Sergeant Moore's reliance on Wiley's contradicted account, we cannot do so. We must instead view the facts "from the perspective of the reasonable official on the scene." *Id.* at 311.

Because Provience has not made the required showing that there was a lack of probable cause for the criminal prosecution, Sergeant Moore is also entitled to qualified immunity on the malicious-prosecution claim. To establish a claim for malicious prosecution under § 1983, Provience "must show that there was a lack of probable cause for the criminal prosecution." *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). Provience has not met that burden here. The trial court considered all the evidence, including Wiley's admittedly contradicted eyewitness account and the accounts of the other witnesses at the scene, and determined that there was probable cause to prosecute Provience. Because the available evidence was sufficient to warrant a prudent officer in believing

that Provience had committed an offense, probable cause existed.  Sergeant Moore is therefore entitled to qualified immunity on Provience's malicious-prosecution claim.

Finally, Provience cannot state a *prima facie* claim of malicious prosecution under Michigan law.  Provience bears the burden of establishing lack of probable cause in a malicious-prosecution action.  *See Matthews v. Blue Cross & Blue Shield*, 572 N.W.2d 603, 609-10 (Mich. 1998).  Michigan law essentially requires that Provience show that a police officer "knowingly [swore] to false facts in a complaint." *Id.* at 615.  Provience has provided insufficient evidence to convince any rational juror that Sergeant Moore did so here.  The district court therefore erred in denying the defendants' motion for summary judgment with respect to Provience's state-law claim of malicious prosecution.

The district court's judgment with respect to the *Brady* claim is affirmed, the district court's judgment with respect to the remaining claims of false arrest and malicious prosecution under federal and state law is reversed, and the case is remanded for further proceedings consistent with this opinion.

**RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part**.

The majority has concluded that the district court properly denied Sergeant Moore's motion for summary judgment with respect to Provience's *Brady* claim, but that the district court erred in denying Sergeant Moore qualified immunity with respect to the false-arrest and malicious-prosecution claims. I fully agree with the majority that the *Brady* claim should go forward. Contrary to the majority, however, I would affirm the district court's denial of summary judgment on the other claims as well. I therefore respectfully dissent from the decision to grant Sergeant Moore qualified immunity on any of the claims raised by Provience.

I.      **Probable Cause**

The crux of my disagreement with the majority is its conclusion that "Sergeant Moore had probable cause to seek a warrant for Provience's arrest." Maj. Op. 11. A lack of probable cause is an essential element of both the false-arrest and the malicious-prosecution claims. The majority has therefore relied on its probable-cause determination to hold that Provience's claims on these issues must fail. That determination is, in my opinion, erroneous under this court's relevant precedents.

"Probable cause justifying an arrest 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010-11 (6th Cir. 1999) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the

arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). This determination rests on "the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis in the original). The totality of the circumstances that existed when Provience was arrested must be construed in the light most favorable to Provience as the party opposing summary judgment below. *See, e.g.*, *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007).

Of all the sources of information known to Sergeant Moore in June 2000, the majority cites only one that purportedly supports the decision to arrest Provience—a statement from Larry Wiley, a drug addict with a prior criminal record who had just been arrested for several burglaries and who claimed to have witnessed Rene Hunter's murder several months earlier. The majority correctly notes that "[o]ur precedent establishes that an investigating officer has probable cause to make an arrest based on an eyewitness account, 'unless, at the time of arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" Maj. Op. 11 (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). But its application of this rule from *Ahlers* is erroneous in two important respects.

First, I question whether *Ahlers* should apply to the present case at all. The *Ahlers* decision cites earlier unpublished decisions of our court for the rule that eyewitness identifications are generally sufficient to support probable cause. *See United States v. Amerson*, No. 93-6360, 38 F.3d 1217, at *2-3 (6th Cir. Oct. 21, 1994) (unpublished table decision); *Rainer v. Lis*, No. 92-2436, 16

F.3d 1221, at *2 (6th Cir. Feb. 7, 1994) (unpublished table decision). These cases in turn adopted the rule from *Gerald M. v. Conneely,* 858 F.2d 378, 381 (7th Cir. 1988). In both *Ahlers* and in the cited cases on which it rests, the eyewitness identifications that the courts held were sufficient to establish probable cause came from either the victims themselves or from someone else unquestionably present when the crime was committed. *See Ahlers*, 188 F.3d at 370 (identification by the victim of a sexual assault); *Amerson*, 38 F.3d 1217, at *1 (identification by a bank teller who was present during a robbery); *Rainer*, 16 F.3d 1221, at *3 (identification by the victim of a robbery); *Gerald M.*, 858 F.2d at 380-81 (identification by a minor who was punched in the face and had his bicycle stolen). Wiley, in contrast, was neither the crime victim nor was he otherwise known by Sergeant Moore to have been at the scene of the crime. The only basis that Sergeant Moore had for believing that Wiley had actually witnessed Hunter's murder was Wiley's own assertion to that effect.

This distinction is important because the reason that eyewitness identifications have been determined to independently support probable cause is that they "are based on firsthand observations" and therefore "are generally entitled to a presumption of reliability and veracity." *Ahlers*, 188 F.3d at 370. Independent corroboration that a putative eyewitness was indeed at the scene of the crime therefore weighs in favor of crediting his or her identification of the perpetrator because it gives the investigating officer more reason to believe that the identification is "based on firsthand observation[]." *See id.* But today the majority, without explanation, applies a rule of

presumptive credibility to a putative eyewitness who lacks independent corroboration of actually having witnessed the crime at all.

Second, even if *Ahlers* does apply here, the majority errs in its application of that precedent because it pays only lip service to the principle that an eyewitness's identification cannot support probable cause if there is an apparent reason at the time of arrest for the police officer to believe that the witness is lying or mistaken. Maj. Op. 11. The majority particularly fails to explain how all of the facts known to Sergeant Moore at the time he sought a warrant for Provience's arrest would not have given him reason to disbelieve Wiley's statement. Indeed, if Sergeant Moore is deemed not to have had an apparent reason to disbelieve Wiley based on the facts in this record, then I believe that the actual standard being applied is that an uncorroborated eyewitness identification supplies probable cause unless the officer has *proof beyond a reasonable doubt* that the witness is lying or mistaken. Such a standard, of course, has no basis in the precedent of this court or the Supreme Court.

Certainly an eyewitness identification need not "be consistent with all other available evidence" nor "comport with every detail of other witnesses' statements" in order to provide probable cause for an arrest. Maj. Op. 11. But when nearly all the other available evidence not only conflicts with the purported identification, but also points consistently to a suspect other than the person identified by the putative eyewitness, then such evidence easily provides an apparent reason to believe that the putative eyewitness is either lying or mistaken.

The majority notes three major discrepancies between Wiley's statement and the statements taken from multiple eyewitnesses at the scene of the crime shortly after the shooting: (1) discrepancies regarding the color and make of the car from which the assailant shot Hunter, (2) discrepancies regarding the number of shots fired, and (3) discrepancies regarding the direction in which the car was driven after the shooting. Maj. Op. 3. A reasonable officer might not pay much heed to conflicts in any one of these details, especially if the officer (unlike in the present case) had an independent reason to believe that the person making the identification actually witnessed the crime. But Sergeant Moore had reason to disbelieve Wiley even beyond the cumulative discrepancies in these material details between Wiley's version of events and the version consistently described by the witnesses who were indisputably at the scene. By the time that Wiley offered his version, the police had statements from witnesses who knew Hunter, who saw him being taken away in a white Cadillac after having a confrontation with one of Sorrell Mosley's nephews, and who saw Terry Mosley follow the Cadillac in a gray Chevrolet Caprice soon before Hunter was shot. Moreover, investigating officers had communicated this information to Sergeant Moore both orally and through written "progress notes."

In contrast, the investigating officers in *Ahlers* and in *Skousen v. Brighton High School*, 305 F.3d 520 (6th Cir. 2002), had little, if any, reason to disbelieve the individual eyewitnesses in those cases, both of whom were the complainants. *See* Maj. Op. 11. And, contrary to the majority opinion's characterization, neither case stands for the proposition that "an admittedly vague and

inconsistent account can provide ample probable cause." *See id.* (internal citations and quotation marks omitted). I will address each of these cases in turn.

*Ahlers* involved a male corrections officer who had been accused by a female inmate in the county jail of forcing the inmate to perform oral sex on him in exchange for food. 188 F.3d at 367. The inmate reported this accusation to another corrections officer and was interviewed three times on the same day regarding her allegations. *Id.* "[E]ach time her story remained consistent." *Id.* Her account given during the interviews was also consistent with what she had told her cellmate about the incident. *Id.* at 368. The inmate's account was also consistent with jail booking documents that "did not account for Ahlers's whereabouts between 12:30 a.m. and 1:00 a.m., leaving a window of time within which the act could have occurred." *Id.* at 367. Furthermore, when the investigating police officer had the complainant place a telephone call to Ahlers, the officer "found it odd that Ahlers was not terribly upset when [she] contacted him at home." *Id.* at 368.

A prosecutor determined that these circumstances provided probable cause to arrest Ahlers and charge him with two counts of criminal sexual conduct. *Id.* Not until the days leading up to Ahlers's rescheduled preliminary hearing did the complainant's "recollection of the incident [become] vague and inconsistent with her prior story." *Id.* This *post*-arrest recollection was not considered relevant to the question of whether there was probable cause to arrest Ahlers and clearly was not the eyewitness statement that the *Ahlers* court concluded had "provided Defendants with ample probable cause." *Id.* at 371. Indeed, the court specified that it was "[t]he facts as *initially*

discovered" that provided the "ample probable cause," *id*. (emphasis added), not the "vague and inconsistent" post-arrest recollection, as the majority suggests.

Unlike in the present case, the plaintiff in *Ahlers* did not even attempt to show that the defendants had an apparent reason to think that the complainant's "eyewitness identification was in some way untruthful or unreliable." *See id.* Ahlers instead "wish[ed] to hold [the defendants] liable for evidence which they failed to collect and, therefore, of which they were unaware." *Id.* at 372. Here, Provience does not argue that Sergeant Moore would have uncovered an apparent reason to disbelieve Wiley's statement had he undertaken further investigation. Rather, Provience contends that Sergeant Moore *already had information in hand* to cast such serious doubt on Wiley's statement that the statement could not provide probable cause for the arrest.

This court's decision in *Skousen* is equally unhelpful to the majority's position. In that case, the investigating officer "obtained the eyewitness testimony of the victim, Rebecca, which was verified by the testimony of her father, another eyewitness." *Skousen*, 305 F.3d at 528. A statement from Rebecca's older sister also supported Rebecca's complaint of abuse at the hands of her mother because it "lent credence to the suggestion that this incident was not the first combative encounter Skousen had with her children." *Id.* Rebecca's complaint was further corroborated by a medical report documenting an injury in the location where Rebecca claimed she had been hit. *Id.* And just as in *Ahlers*, the plaintiff in *Skousen* "presented neither any evidence nor any facts in her Complaint suggesting that [the investigating officer] had reason to believe that either [Rebecca or her father] was untruthful." *Id.* These facts are clearly distinguishable from the record in the present case.

In sum, neither *Ahlers* nor *Skousen* supports the outcome reached by the majority. Instead, this court's decision in *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), is far more on point. The relevant issue in that case was whether a police officer had probable cause to arrest two storeowners for stealing goods from a neighboring store. *Gardenhire*, 205 F.3d at 315. Despite an investigating officer's belief that the plaintiffs "had been set up," *id.*, based on the "oddly conspicuous" location where the allegedly stolen objects were found, the plaintiffs were told that they would be "booked on charges of theft, burglary and criminal trespass," and were presented to a magistrate judge, *id.* at 309. The magistrate judge also thought that the plaintiffs had been set up, *id.* at 315, and determined that probable cause was lacking for their arrest, *id.* at 309. Although this court noted that "there was substantial inculpatory evidence against the Gardenhires," *id.* at 316, such as the discovery of reported stolen items in the Gardenhires' store, it nonetheless held that their false-arrest claim should go to the jury, *id.* 318.

Similar to the circumstances in *Gardenhire*, the police officers investigating Hunter's murder believed, based on statements from multiple witnesses that corroborated one another, that one of Sorrell Mosley's nephews was the shooter and likewise thought that Wiley was lying when he identified Provience as the shooter. And whereas the officer in *Gardenhire* had independent inculpatory evidence apart from the complainant's statement that the goods had been stolen, the sole information on which Sergeant Moore could rely in arresting Provience was Wiley's statement. This is presumably why the only information that Sergeant Moore included in his request for an arrest warrant was that Wiley had identified Provience as the shooter, omitting all of the other information

that the police had gathered in three months of investigating Hunter's murder. I therefore conclude that a jury could find from the facts in the record that Sergeant Moore arrested Provience without probable cause.

## II.     Qualified Immunity

Furthermore, Sergeant Moore is not entitled to qualified immunity because Provience's right to be free from arrest in the absence of probable cause was "clearly established" in a "particularized . . . sense" at the time of his arrest. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). To guide the inquiry, this court may look to decisions of the Supreme Court, its own decisions, and the decisions of other courts within the Sixth Circuit and its sister circuits. *Siggers-El v. Barlow*, 412 F.3d 693, 703 (6th Cir. 2005).

Couching the qualified-immunity analysis in terms of whether an officer acted intentionally, knowingly, recklessly, or negligently, *see* Maj. Op. 11 (citing *Ahlers*, 188 F.3d at 373-74), only muddles what *Saucier* instructed should be the court's focus; *i.e.*, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," 533 U.S. at 202. Whether that inquiry is better characterized as a recklessness standard than a negligence standard is beside the point. The key issue is whether Sergeant Moore's conduct "fell below an objective standard of reasonableness" with respect to a clearly established right, *see Ahlers*, 188 F.3d at 373, not whether his conduct "demonstrated knowing or intentional behavior designed to violate

-22-

[Provience's] constitutional rights," Maj. Op. 11 (quoting *Ahlers*, 188 F.3d at 373-74); *see also*

*Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (setting "the limits of qualified immunity

essentially in objective terms").

At the time of Provience's arrest, this court had established that an eyewitness's identification

may constitute probable cause for an arrest unless there is an apparent reason for the officer to

disbelieve the eyewitness. *See Ahlers*, 188 F.3d at 370. The law was likewise well established that

an officer seeking an arrest warrant may not ignore exculpatory evidence reasonably available to the

officer when assessing probable cause. *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.

1999) ("The law has been clearly established since at least the Supreme Court's decision in *Carroll*

*v. United States*, 267 U.S. 132, 162 (1925), that probable cause determinations involve an

examination of all facts and circumstances within an officer's knowledge at the time of an arrest."

(emphasis omitted)). That the exact circumstances of the present case have not been held actionable

does not preclude a finding that the right violated was clearly established. *See Hope v. Pelzer*, 536

U.S. 730, 741 (2002) (explaining that "officials can still be on notice that their conduct violates

established law even in novel factual circumstances").

As discussed above, a jury could easily find that the facts available to Sergeant Moore at the

time that he sought the warrant to arrest Provience provided ample and apparent reason to question

the veracity of Wiley's statement. The fact that none of the officers investigating Hunter's murder

(possibly including Sergeant Moore himself) thought that Wiley's statement was accurate further

supports the conclusion that a reasonable officer in Sergeant Moore's position would have

recognized the apparent reasons to doubt the statement's veracity. Sergeant Moore's decision to pursue an arrest warrant under these circumstances therefore raises a triable jury issue that should preclude granting Sergeant Moore qualified immunity on the claims in question.

The majority's determination—as a matter of law—that Sergeant Moore had probable cause to arrest Provience is the basis for its decision to reverse the district court's judgment with respect to both the false-arrest and malicious-prosecution claims. Maj. Op. 11-12. Because I do not join in this determination, I would affirm the district court's denial of Sergeant Moore's motion for summary judgment on all grounds.