RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0279p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DARRELL SIGGERS-EL,

*Plaintiff-Appellee,*

*v.*

DAVID BARLOW,

*Defendant-Appellant.*

No. 03-2291

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-72729—Arthur J. Tarnow, District Judge.

Argued: October 28, 2004

Decided and Filed: June 24, 2005

Before: KENNEDY and GILMAN, Circuit Judges; HOOD, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Kevin R. Himebaugh, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Paul D. Reingold, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Kevin R. Himebaugh, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Paul D. Reingold, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellee.

_____

## OPINION

_____

KENNEDY, Circuit Judge. Plaintiff Darrell Siggers-El, a prisoner in Michigan's correctional system, brought this claim against his resident unit manager (RUM), Defendant David Barlow, in which he alleged that the Defendant transferred him to another prison in retaliation for exercising his First Amendment rights when he complained to the Defendant's supervisors that the Defendant had failed to authorize disbursements of money from the Plaintiff's prison account to pay his lawyer to review his appellate brief and file and to meet with him concerning his criminal conviction. The Defendant moved for summary judgment on the basis of qualified immunity, arguing that it was not clearly established that 1) a prisoner engages in protected conduct when he complains about a prison officer's failure to perform his duties to the officer's supervisor, and 2) a transfer in retaliation for engaging in such conduct constitutes

_____

[*] The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

an adverse action. The district court denied the Defendant's motion. For the following reasons, we AFFIRM.

## I.

The only issue presented in this appeal is whether the district court erred in denying Defendant Barlow qualified immunity. For purposes of determining whether a defendant is entitled to qualified immunity, we must first determine whether, based upon the applicable law, the facts (viewed in the light most favorable to the plaintiff) show that a constitutional violation has occurred. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the violation is made out, the next sequential step is to ask whether the violation involved a clearly established right of which a reasonable person would have known. *Id*.

In the fall of 2000, Siggers-El was incarcerated at the Mound Correctional Facility in Detroit, Michigan. While there, he contacted a lawyer who agreed to review his appellate brief and file concerning his criminal conviction for $300. To withdraw funds from his prison account to pay the lawyer, Siggers-El needed to obtain an authorization from Barlow. When Siggers-El went to Barlow with the disbursement form, Siggers-El testified, Barlow observed the surname "El" as part of Siggers-El's attorney's name and asked a series of questions concerning the attorney. Barlow asked whether Siggers-El's attorney was black, and if she was a part of his religious organization. After Siggers-El responded yes to both questions, Barlow stated, "I don't mean for this to sound racist, but you would probably have a better chance with a white lawyer." When Siggers-El asked Barlow why he believed this, Barlow replied, "since most crimes are committed by blacks, judges tend to associate black lawyers with crime. I know these things. My brother-in-law is a lawyer." Siggers-El disregarded Barlow's comments and insisted that he wanted the lawyer in question. Barlow, however, refused to authorize the disbursement.

A few hours later, Siggers-El saw Assistant Deputy Warden Thomas Roger, who was Barlow's immediate supervisor. Siggers-El showed Roger the letter from his attorney and informed him of Barlow's refusal to authorize his disbursement. Roger then immediately called Barlow on the phone from the dining room, and, in Siggers-El's presence, asked Barlow about the disbursement and instructed him to process it. When Siggers-El returned to his housing unit Barlow had him summoned to his office and angrily stated, "If you ever go over my head again, your ass is out of here."

In early January 2001, Siggers-El required an additional $300 to pay his lawyer to come to the prison to interview him. Siggers-El prepared another disbursement form and submitted it to Barlow. When Siggers-El heard nothing about the disbursement for a week, he went to Barlow and asked him to check on its status. Barlow said that he would and that Siggers-El should get back to him later in the day. When Siggers-El returned a few hours later, Barlow advised him that his disbursement had been processed and that the money had been sent. The next day, Siggers-El's disbursement was returned to him marked "rejected" because it had not been signed by the warden. Upon receiving the rejected disbursement, Siggers-El showed it to Barlow and asked, "Why did you tell me you had checked on my disbursement and that the money had been sent?" Barlow told Siggers-El to get out of his office. Thereafter, Siggers-El explained the situation to the warden's administrative assistant and asked if he could expedite the process. The next day, Barlow summoned Siggers-El to his office and said "Didn't I tell you what would happen if you ever [went] over my head again?" After Siggers-El replied, "What are you talking about, man?," Barlow stated, "You'll see. Get out of my office." Two days later, Barlow filled out a Security Classification Screen designating Siggers-El "for transfer."

Security classification screens (or transfer screens) are significant because a prisoner cannot be transferred until one is performed. These screens are filled out for two primary reasons. First, an "annual" screen is filled out to confirm that inmates are being housed at the appropriate security level. The annual screen is done on the anniversary date of the previous screen. It is triggered by the date alone, thus ensuring that all inmates are screened at least once a year. The second reason for filling out a security classification

screen is in conjunction with a transfer. A transfer order - the document that actually authorizes the prisoner's movement - must be accompanied by a transfer screen to show that the prisoner is being moved to an appropriate level facility. As a result, the transfer screen is normally filled out when the prisoner is selected for transfer.

Assistant Deputy Warden Roger testified that, apart from transfers for disciplinary or medical reasons, "99.9 percent of the time" transfers are done on a trade basis. Transfers conducted on a trade basis are usually initiated when one facility informs another that it needs additional prisoners. At that point, the transfer coordinator at the receiving facility would let the resident unit managers know that a specific number of inmates are needed for an exchange. If there are prisoners who have requested a transfer, they may already be in the "transfer pool." Otherwise, it is the RUMs who select which inmates to transfer. Although the transfer coordinator has ultimate authority to approve the transfer, if the selected inmates meet the transfer requirements, the transfer coordinator will not request different prisoners to trade.

ADW Roger also testified that a RUM would normally prepare a transfer screen only after the transfer coordinator informed him that another facility requested a transfer. A RUM would typically have no more than one week's notice of a transfer request before the transfer would need to occur. Moreover, Roger testified, the transfer order would be prepared at or about the same time as the transfer screen and by the same person (that is, by the RUM).

Barlow filled out a transfer screen on Siggers-El on February 2, 2001. The transfer order, however, was not prepared until February 28, 2001. As of February 2, 2001, Barlow could not show that any request for a trade had been relayed to him from the transfer coordinator. Thus the evidence suggests, Siggers-El contends, that the reason why Barlow did not fill out a transfer order at the same time as the transfer screen was because no request for a transfer had yet been received by him. That is, when Barlow filled out the transfer screen on Siggers-El on February 2, 2001, and marked it "for transfer," it was because Barlow - not someone else - was selecting Siggers-El for transfer.

Siggers-El asserts that a look at the transfers from Mound Correctional Facility between January 1 and March 15, 2001, confirms this assertion. Of the 32 inmates transferred during that period, 31 out of the 32 had their transfer screens and their transfer orders filled out either on the same day or within one day of each other. Only Siggers-El had his transfer screen prepared at the very beginning of the month, with his transfer order not written until almost four weeks later, when the need to find prisoners for transfer existed. In addition, 15 of the 32 inmates were transferred within two days of the date of their screen and most of the rest were transferred within a week (the longest outlier was two weeks). Again, only Siggers-El, who was transferred on March 2, 2002, was not transferred until almost 30 days after the date of his transfer screen. Siggers El was transferred to Adrian Regional Facility, which is located near Adrian, Michigan, over seventy miles from Detroit. As a result of the transfer, Siggers-El lost his high paying job at Mound Correctional Facility that he needed to pay his lawyer. Moreover, the transfer made it more difficult for Siggers-El's attorney to visit and represent him by moving him to a remote prison.

## II.

We review a district court's denial of summary judgment de novo. *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 616 (6th Cir. 2003). All justifiable inferences must be drawn in the light most favorable to the non-moving party, namely Siggers-El. Qualified immunity is a question of law that we also review de novo. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

As noted above, in determining whether a defendant is entitled to qualified immunity, we must first determine whether the facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation has occurred. If the violation is made out, we then ask whether the violation involved a clearly established right of which a reasonable person would have known.

**A.**

The Plaintiff alleges that the Defendant retaliated against him for exercising his First Amendment rights when he, in an attempt to get his attorney paid, informed the Defendant's supervisor that the Defendant was not releasing funds from his prison account to pay his attorney. The applicable law we must consult to determine if the Plaintiff presented sufficient evidence to establish a First Amendment retaliation claim is outlined in *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999). *Thaddeus-X* provides that a plaintiff must prove that 1) he engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct.[1] *Id.*

The Defendant argues that there is no constitutional violation here because the Plaintiff did not engage in protected conduct. The Defendant maintains that although a prisoner has a right to file non-frivolous lawsuits and grievances, a prisoner may not, as the Plaintiff did, orally complain to an officer's superior regarding the officer's conduct. This act of "going over the heads" of prison officials is not protected, the Defendant asserts, because it is "inconsistent with [plaintiff's] status as a prisoner or with the legitimate penological objectives of the corrections system" for it is disruptive to the orderly function of the prison.[2]

The Defendant's characterization of the Plaintiff's conduct is not accurate. The Plaintiff's conduct is not simply that of going over the Defendant's head in lodging a complaint. Rather, the Plaintiff's petition to the Defendant's supervisor was a part of his attempt to access the courts.[3] It is well established that prisoners have a constitutional right of access to courts to attack their sentence. *Thaddeus-X*, 175 F.3d at 391 (citing *Lewis v. Casey*, 518 U.S. 343, 355 (1996)). To access the courts, the Plaintiff needed to pay the attorney who was going to review his appellate brief and file relating to his criminal conviction. When the Defendant failed to sign the first disbursement form, the Plaintiff had a right in attempting to access the courts to petition the Defendant's supervisor and to seek his help in seeing the funds were sent. Similarly, when the Defendant told the Plaintiff that the second disbursement form had been processed and that the check had been issued and sent to Plaintiff's attorney, when the disbursement form had in fact been rejected, the Plaintiff had the right to request the assistance of the Defendant's supervisor to see that the money was sent.

---

[1] The defendant raises arguments challenging the district court's denial of qualified immunity only with respect to the first two prongs of this test. The defendant does not argue that the plaintiff failed to show a casual connection between the plaintiff's protected conduct and the adverse action. If he had, the argument would fail, as the plaintiff proffered sufficient evidence to create an issue of fact of a causal connection between the adverse action and the protected conduct.

[2] Although the defendant correctly notes that if a prisoner violates a legitimate prison regulation, then the prisoner is not engaged in protected conduct, he fails to cite any prison regulation that the plaintiff may have violated.

[3] The Defendant may argue that if the Plaintiff's conduct was in furtherance of his right to access the courts (rather than complaining to the Defendant's supervisors), then there would be no casual connection between the alleged retaliatory transfer and this conduct since the Defendant's motivation for transferring the Defendant was based on the fact that the Plaintiff petitioned the Defendant's supervisors, not that the substance of the petition involved the Plaintiff's attempt to access the courts. There must be a casual connection between retaliation and protected conduct because the constitutional tort is designed to prevent an individual from being deterred from exercising his protected conduct. If there is no casual connection between the retaliation and an individual's protected conduct, then the retaliation could not have deterred the individual from engaging in that protected conduct. In this case, the Defendant's actions, even if not substantially motivated by the substance of the Plaintiff's petition to his supervisors, would certainly deter someone from exercising protected conduct since, as evidenced by this case, in order for a prisoner to pursue his right to access the courts, the prisoner may frequently need to follow up upon his requests to prison officials and to seek a supervisor's aid in processing his requests when the requests are not acted upon. The Defendant cannot immunize himself from the deterrent consequences of his actions simply by asserting that his retaliation was not motivated by the fact that the substance of the Plaintiff's complaint related to his attempt to access the courts when it is reasonable to foresee that his retaliation would deter a prisoner from accessing the courts.

Moreover, the Defendant's contention that what the Plaintiff did is disruptive and thus "violates legitimate penological objectives" is rebutted by the record. The defendant even admitted that the plaintiff did nothing wrong:

Q.    There's nothing wrong with Mr. Siggers-El going to Tom Roger, is there?
A.    Not really. Prisoners do that very frequently. They go to people's supervisors an awful, awful lot to speed up the process.
Q.    And he has a right to do that, as it were?
A.    [T]hey're not really supposed to do that . . . *unless someone hasn't done* [his or her] *job*, but it occurs so often it's pretty much accepted.
Q.    And it's not the sort of thing he can be punished for doing?
A.    No.

If appealing to a prison supervisor under these circumstances were inappropriate or unprotected conduct, then one would expect that when the plaintiff complained to ADW Roger about the first disbursement, the assistant deputy warden would have reacted very differently. Instead of picking up the phone, asking the Defendant what was going on, and ordering him to sign the form, ADW Roger would have denied the Plaintiff's request out of hand. No doubt when the Plaintiff went to the warden's assistant for help with the second disbursement, he would have done the same thing. But neither ADW Roger nor the warden's assistant rejected Plaintiff's request, disciplined him, or even admonished him. To the contrary, they treated his complaints as legitimate reports from an inmate about a block officer who "was not doing his job."

The Defendant next argues that even if we were to find that the Plaintiff engaged in protected conduct, the Plaintiff nonetheless failed to establish a First Amendment constitutional violation because the Defendant did not take an adverse action against the Plaintiff. The Defendant raises two arguments to support this contention. First, the Defendant contends, he did not take an adverse action against the Plaintiff because *he* did not transfer the Plaintiff. Rather, the Defendant asserts, he only completed a security screen, which simply made the Plaintiff eligible for a routine transfer. The fact that the Defendant's completion of a security screen of the Plaintiff was not a sufficient condition to transfer the Plaintiff, in that the transfer coordinator must ultimately approve the transfer, does not lead to the conclusion that the transfer cannot be imputed to the Defendant. Rather, the Defendant's performance of the security screen of the Plaintiff set in motion Plaintiff's transfer. That is, without the security screen, he had the same chance as every other prisoner to be transferred. Thus, the Defendant filled out the screen knowing the effect it would have – that it would lead inexorably to the plaintiff's transfer, which is exactly what occurred.

The Defendant also argues, even if the transfer is attributed to him, a lateral transfer to the general population of another prison does not constitute an adverse action. "[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). In discussing the level of conduct necessary "to deter a person of ordinary firmness," the *Thaddeus-X* court concluded as follows:

We emphasize that while certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.

*Thaddeus-X,* 175 F.3d at 398. Also, as the *Thaddeus-X* court noted, "since there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable." *Id*. at 397 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). A constitutional tort, however, requires that the plaintiff suffer an injury, and it would certainly "trivialize the First Amendment to hold that harassment for exercising [one's constitutional rights] was always

actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . ." *Id.* Thus, the test is, if a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act may not be dismissed at the summary judgment stage. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

In the case here, we conclude that a reasonable trier of fact could conclude that the Defendant's retaliatory transfer of the Plaintiff would deter a prisoner of ordinary firmness from continuing to engage in the protected conduct (that is, that the Defendant suffered an adverse action). Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct. *See Smith v. Yarrow*, No. 01-4033, 2003 WL 22300730, at \*12 (6th Cir. Oct. 20,2003) (collecting cases). In this case, however, the transfer would deter a person of ordinary firmness from engaging in protected conduct, since here, the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her.

The Defendant in response raises two arguments. First, he contends, if a transfer were to constitute an adverse action, then prisoners would be able to insulate themselves from routine transfers simply by alleging that the transfer was in retaliation for engaging in some prior protected conduct. If this were the case, the Defendant continues, then no prisoner who engaged in protected conduct could be transferred, even if the transfer were routine or otherwise necessary for operational needs of the correctional system. This reasoning is flawed as it ignores the causal requirement necessary to establish a constitutional violation between the protected conduct and the retaliatory act. If a transfer were *truly* routine or otherwise necessary for operational needs (because of discipline problems, for instance) then the transfer would not have been in retaliation to the exercise of protected conduct. *See Thaddeus-X*, 175 F.3d at 399 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)); *Ward v. Dyke*, 58 F.3d 271 (6th Cir. 1995) (holding that prison officials could permissibly transfer a prisoner from one Level II facility to another in order to give prison staff a respite from plaintiff's continuous barrage of grievances). That is, "if the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

Second, the Defendant argues that he should not be held responsible for the adverse consequences that followed from the transfer since this Court's test is not "adverse action plus any and all subsequent consequences that could possibly be construed as resulting from the adverse action taken by the defendant." If this were the test, the Defendant asserts, then anything bad that happened to a prisoner after a prison official took an adverse action would then be attributed to the prison official. For instance, if the Plaintiff had been assaulted at the prison he were transferred to, the Defendant contends, then he could have attributed even this event to the Defendant. The Defendant overstates his argument. Only those consequences that inextricably follow from a defendant's alleged retaliatory conduct (a transfer from filling out a transfer screen, for instance) would be considered in determining whether the plaintiff suffered an adverse action. Similarly, a court may consider the reasonably foreseeable consequences that would follow from a retaliatory act in considering whether the plaintiff suffered an adverse action. However, a defendant would not be held responsible for consequences unless his conduct were the proximate cause of them (which would not be the case in the defendant's above hypothetical). *See Scott v. Churchill*, 377 F.3d 565, 571 (6th Cir. 2004) (noting that qualified immunity "should be judged based on the actions of the officer and the reasonably foreseeable consequences of those actions, not subsequent events outside of the officer's control).

**B.**

Finally, we must address the Defendant's argument that, even if we find that the Plaintiff stated a constitutional retaliation claim, the violation did not involve a clearly established right of which a reasonable officer would have known. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "Although it need not be the case that 'the very action in question has previously been held unlawful, . . . in the light of pre-existing law, the unlawfulness must be apparent.'" *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson*, 483 U.S. at 640). As the Supreme Court has explained, an official "can still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v Pelzer*, 536 U.S. 730, 741 (2002). In essence, we will impose liability (and only impose liability) "when a public-official defendant 'knew or should have known' of the constitutionally violative effect of his actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 820-21 (Brennan, J., concurring) (1982). For purposes of determining whether a constitutional right is clearly established, we "look [] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Bell*, 308 F.3d at 602 (quoting *Chappel v. Montgomery Fire Prot Dist. No 1,* 131 F.3d 564, 579 (6th Cir. 1997)).

A reasonable officer would certainly know that the right to access the courts is clearly established and that an officer would be liable if he retaliated against a prisoner for pursuing his right to access the court where the prisoner suffered an adverse action such that a reasonable person in the prisoner's position would be deterred from exercising his right. *Thaddeus-X*, 175 F.3d at 391, 394 ("It is well established that prisoners have a constitutional right of access to the courts. . . . In the usual claim alleging denial of access to the courts, an inmate claims that the lack of legal assistance made it impossible for him to take some meritorious legal action. In a retaliation claim such as this, however, the harm suffered is the adverse consequences which flow from the inmate's constitutionally protected action. Instead of being *denied* access to the courts, the prisoner is penalized for actually exercising that right."). This begs the question of whether a reasonable officer would clearly know that transferring a prisoner for exercising his right to access the courts, which results in the prisoner's loss of his high prison job needed to pay his attorney and makes it more difficult for the prisoner's attorney to meet and represent him, would deter a prisoner of ordinary firmness from continuing to engage in protected conduct.

At the time of the Defendant's conduct, the standard as to what constitutes an adverse action was clearly established. As noted above, this Court has held that if no reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act should be characterized as *de minimis* and dismissed at the summary judgment stage. In all other cases, however, "[w]hether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a *question of fact*." *Bell v. Johnson*, 308 F.3d at 603. Even if a plaintiff suffers an adverse action, a defendant will not be held liable if he could reasonably believe that his conduct would not deter a person from continuing to engage in the protected conduct. The Defendant, in maintaining that he could reasonably believe that his conduct of transferring the Plaintiff would not deter a prisoner from continuing to engage in protected conduct, relies upon a string of unpublished cases in our circuit that have held that a transfer does not constitute an adverse action since a transfer is merely an ordinary incident of prison life. *See Smith v. Yarrow*, No. 01-4033, 2003 WL 22300730, at *12 (6th Cir. Oct. 20, 2003) (collecting cases). Although we held that the transfers in those prior cases would not have deterred a prisoner of ordinary firmness from engaging in protected conduct under the circumstances present in those cases, we have noted that a transfer certainly could deter a prisoner of ordinary firmness from engaging in protected conduct. *Friedman v. Corr. Corp. of Am.*, No. 99-6587, 2001 WL 467990 (6th Cir. Apr. 26, 2001). In this case, we hold that a reasonable officer would

certainly know that a retaliatory transfer for a prisoner's exercise of his right to access the courts which inhibits the prisoner's ability to access the courts would deter a person of ordinary firmness from continuing to engage in the protected conduct. Since the Defendant "knew or should have known of the constitutionally violative effect of his actions," he is not entitled to qualified immunity as a matter of law. *Harlow*, 457 U.S. at 820-21 (Brennan, J., concurring).

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.