NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0527n.06

Case No. 22-3030

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>STACEY ARNOLD YERKES,</td><td>)</td><td rowspan="9"><strong>FILED</strong><br>Dec 19, 2022<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | | |
|---|---|---|
| STACEY ARNOLD YERKES, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| OHIO STATE HIGHWAY PATROL, et al., | ) | DISTRICT OF OHIO |
| Defendants, | ) | |
| | ) | |
| GENE SMITH; MICHAEL KEMMER, | ) | O P I N I O N |
| WILLIAM STIDHAM; SCOTT WYCKHOUSE, | ) | |
| Defendants - Appellants. | ) | |
| | ) | |

Before: McKEAGUE, THAPAR, and READLER, Circuit Judges.

**McKEAGUE, Circuit Judge.** Plaintiff-Appellee Stacey Yerkes, a former Ohio State Highway Patrol employee, claims that Defendants-Appellants Lieutenant William Stidham, Captain Michael Kemmer, Major Gene Smith, and Scott Wyckhouse caused her to be constructively discharged from her job, due to her sex and/or sexual orientation. She brought suit against Defendants under § 1983 for sex discrimination in violation of the Fourteenth Amendment. Defendants appeal the district court's denial of qualified immunity for all four of them, alleging that their actions do not constitute a constitutional violation and that the law regarding their actions was not clearly established. Because our caselaw on this issue is conflicting, and thus the law is not clearly established, we REVERSE.

## I.  Facts and Procedural History

### A. Facts

Plaintiff Stacey Arnold Yerkes worked at the Ohio State Highway Patrol from 1994 until 2018. Yerkes identifies as a gay female. The four Individual Defendants in this case—Lieutenant William Stidham, Captain Michael Kemmer, Major Gene Smith, and Scott Wyckhouse—worked with Yerkes at the Patrol. Yerkes' direct supervisor was Lieutenant Nathan Dickerson, who is not a party to this suit. Defendant Stidham was Dickerson's supervisor, Defendant Kemmer was Defendant Stidham's supervisor, and Defendant Smith was Defendant Kemmer's supervisor. Defendant Wyckhouse was one of Yerkes's coworkers. At the time of the relevant events, Yerkes worked as a Criminal Interdiction Training Sergeant, training law enforcement officers.

Yerkes alleges that beginning in 2017, Defendants targeted and criticized her for minor infractions that other officers frequently engaged in without comment. These issues included leaving her vehicle on and unattended and failing to wear her Patrol-issued hat during a traffic stop. Yerkes also alleges that—in contrast to similarly situated men in her position—she was required to perform "demeaning" tasks that did not fall within her job description. Yerkes provided evidence in the form of testimony from Dickerson that Defendants Kemmer, Stidham, and Wyckhouse made discriminatory and degrading comments about women, such as calling them slurs and questioning their merit. Dickerson also attested that slurs were used in the presence of Defendant Smith, who did not attempt to put a stop to them or to censure the speakers. Finally, Dickerson attested that Defendants Kemmer and Stidham made potentially misogynistic and homophobic comments specifically about Yerkes.

Yerkes complained about her alleged differential treatment by Defendants to Dickerson on December 6, 2017. She also complained about her perceived treatment on January 26, 2018, in a

Patrol meeting attended by Defendants Kemmer and Stidham. Three days later, on January 29, 2018, she filed a charge with the Equal Opportunity Employment Commission based on sex and sexual orientation discrimination.

The next day, Defendant Wyckhouse told Defendant Stidham that several of his supervisees were discussing and were upset about a tattoo on Yerkes's forearm that she supposedly covered with an approved medical sleeve,[1] in a potential violation of Patrol policy.[2] Yerkes obtained the tattoo in 2017. Defendant Stidham and Defendant Wyckhouse reported the tattoo issue to Defendant Kemmer. On February 2, 2018, Defendant Kemmer called a meeting with Yerkes and requested that she take off the medical sleeve and show her tattoo (or lack thereof). When Yerkes declined to do so, Defendant Kemmer told her she was being insubordinate. Defendant Kemmer told Defendant Smith what occurred, and Defendant Smith reported the issue to the Office of Personnel.

The Office of Personnel investigated and created a report for the incident. Yerkes was charged with (1) violating the tattoo policy and (2) insubordination for declining to show Defendant Kemmer her tattoo. Captain Linek—at the time head of the Office of Personnel—and his staff[3] reviewed the report and recommended that Yerkes be terminated unless she agreed to

---

[1] Defendant Stidham attests that he had already heard rumors about the tattoo in August 2017, which he discussed with Dickerson and later the Office of Personnel and his supervisor at the time, Captain Richard Meadows. Defendant Stidham alleges that Meadows told him that Dickerson, as Yerkes's direct supervisor, would follow up regarding the problem. Finally, Defendant Wyckhouse attests that he, Dickerson, and Defendant Stidham discussed the tattoo rumors again in October 2017, at which time Dickerson allegedly lied and said that he checked and that Yerkes did not have the tattoo.

[2] The policy states: "(3) All uniformed employees . . . hired prior to July 22, 2015 [such as Yerkes], with tattoos, brandings, or body art that are visible in any class of uniform shall not be required to remove the existing tattoo, branding, or body art but shall not add to, modify, enhance or receive additional tattoos, brandings, or body art. . . . (4) Tattoos, brandings, or body art will be covered by any employee while representing the Division and not in uniform at any event or meeting, i.e., speech details, court appearances, public events, etc." R. 104-6 at PID 6362.

[3] Captain Linek also attested that supervisors are consulted regarding their subordinates' discipline as a "matter of course," and that he did in fact consult with Defendant Kemmer regarding Yerkes's discipline. R. 86, PID 3809–11, 3881–82, 3923–24.

sign a Last Chance Agreement (LCA). The LCA would have demoted her, diminished her job responsibilities, and required her to get her tattoo removed. The LCA further mandated that Yerkes waive her legal rights concerning the incident, waive her right to file future EEOC charges about past activity, and withdraw her current EEOC charge. The disciplinary decision was approved by John Born, Director of the Department of Public Safety. On February 12, 2018, Yerkes chose to retire instead of accepting the LCA or being terminated and having her file marked with a "not in good standing" designation. Her successor was a male.

Because Yerkes wore an allegedly approved medical sleeve that covered the tattoo, there is a factual dispute as to whether Yerkes' tattoo violates the policy. There is also a factual dispute as to whether the tattoo in combination with the supposed insubordination would normally constitute a fireable offense. Yerkes alleges that multiple other troopers—males—had tattoos in violation of the policy but were never reported or disciplined for them. Defendants allege that some other troopers did face discipline for their tattoos. The Patrol's Rule 30(b)(6) deponent admitted that the Patrol relied on supervisors to report infractions of the tattoo policy, and that "but for" supervisors investigating and reporting an officer's tattoo violation, that officer would never be disciplined. R. 104 at PID 6036–37.

**B. Procedural History**

On May 20, 2019, Yerkes filed this action in the Southern District of Ohio against the Individual Defendants as well as the Patrol. She sued the Individual Defendants under 42 U.S.C. § 1983 for violating her constitutional right to Equal Protection by discriminating against her on the basis of her sex and sexual orientation. She sued the Patrol alleging that the Patrol discriminated and retaliated against her based on her sex and sexual orientation in violation of Title VII of the Civil Rights Act of 1964. The Individual Defendants filed a motion to dismiss, which the district

court denied. Discovery proceeded, and then all Defendants moved for summary judgment, with the Individual Defendants additionally moving for summary judgment on qualified immunity grounds.

On December 30, 2021, the district court denied summary judgment on all claims and denied the Individual Defendants qualified immunity. The district court concluded that Yerkes's Title VII and § 1983 claims were sufficient to survive summary judgment. Using the *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the district court determined that Yerkes suffered an adverse employment action in the form of constructive discharge, and that she had provided sufficient evidence for a jury to find that the Patrol's reasons for the constructive discharge (her tattoo and insubordination) were pretextual. In determining whether either the Patrol or the Individual Defendants could be held liable where the final decisionmaker regarding the adverse employment action (Colonel Born) was not alleged to have demonstrated any bias, the district court referenced the "cat's paw" theory of liability, whereby "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable." R. 112 at PID7258–59 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). The district court's determinations regarding the Patrol are not the subject of this appeal.

Finally, the district court denied qualified immunity. The court noted that Yerkes alleged that "the Individual Defendants forced [Yerkes] into retirement," and stated that "there is clearly established law protecting female employees from arbitrary discrimination based on sex or sexual

5

orientation for § 1983 purposes." *Id.* at 7253. The Individual Defendants appealed the denial of qualified immunity.

## II. Jurisdiction

Plaintiff alleges that this Court does not have jurisdiction over this appeal, contending that Defendants are making a fact-based challenge inappropriate for interlocutory review. We have jurisdiction to review on interlocutory appeal a district court's denial of qualified immunity. *See* 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). However, this review is restricted: we can consider "only purely legal questions." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019). We cannot review disputed facts at this stage, or even exercise jurisdiction "where the issue of qualified immunity turns on contested issues of fact." *Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011). "[I]f the facts are disputed, as they often are, the court must presume the plaintiff's version of the facts." *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). If an appeal challenges solely a district court's "determination of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial," then it must be dismissed. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (quoting *Johnson v. Jones*, 515 U.S. 304, 313, (1995)) (internal quotation marks omitted).

There are only two exceptions to this rule. First, we may review appeals where the defendant, "despite disputing a plaintiff's version of the story," concedes "the most favorable view of the facts to the plaintiff for purposes of the appeal." *Gillispie v. Miami Twp., Ohio*, 18 F.4th 909, 916 (6th Cir. 2021) (quoting *Adams v. Blount Cnty., Tennessee*, 946 F.3d 940, 948 (6th Cir. 2020)). Second, in the "exceptional" case, we may review a challenge to the district court's factual determination "if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Adams*, 946 F.3d at 948 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

6

However, even if a defendant in a partially fact-based appeal fails to meet either of these exceptions, we may separate the legal issues from the factual—i.e., we can "still review 'pure question[s] of law, despite the defendants' failure to concede the plaintiff's version of the facts[.]" *Adams*, 946 F.3d at 948 (quoting *Livermore ex el. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007)). In the course of this review, we put aside the defendant's factual challenges and answer the purely legal questions, instead of dismissing for lack of jurisdiction. *See id.*

Defendants appear to challenge factual determinations and inferences in their appeal. They continually argue that Yerkes' tattoo violated Patrol policy, despite the district court noting that there was a genuine dispute as to that issue. Further, Defendants' brief frequently speaks in sufficiency-of-the-evidence terms, using phrases such as "factual ability" and "no evidence." *See, e.g.*, Appellants' Br. at 6, 25, 30. And the exceptions to fact-based appeals do not apply in this case. Defendants do not concede the most favorable view of the facts to Yerkes. In addition, beyond reciting the standard, Defendants make no substantive attempt to argue that the district court's factual determinations "blatantly contradicted" the record. *See Barry v. O'Grady*, 895 F.3d 440, 444 (6th Cir. 2018) ("[Defendant] does not explain why any of the district court's conclusions were blatantly and demonstrably false; he merely disagrees with them.").

However, it is possible and indeed simple in this case to wall off any factual disputes and answer the legal question at the core of Defendants' appeal: namely, whether their actions—under the facts taken in the light most favorable to Yerkes—constitute a clearly established constitutional violation. Much of the Defendants' fact-based arguments revolve around their ability to influence (rather than be a but-for cause of) the decision that was made regarding Yerkes's employment—an issue which the district court did not discuss in any detail. We may exercise jurisdiction by ignoring Defendants' factual challenges, taking the facts in the record in the light most favorable

to Yerkes, and focusing on the purely legal issue at hand. *See, e.g.*, *Livermore*, 476 F.3d at 403 ("We therefore conclude that this court has jurisdiction over defendants' interlocutory appeal to consider whether, accepting the facts as alleged by [the plaintiff], defendants are entitled to qualified immunity. . . ."); *cf. DeCrane v. Eckart*, 12 F.4th 586, 603 (6th Cir. 2021) ("[L]egal arguments about the proper meaning of the First Amendment's causation element would fall within our jurisdiction if raised in a qualified-immunity defense."). Thus, this Court has jurisdiction to hear this appeal, though we are careful to address only legal issues.

### III. Qualified Immunity

We review de novo a district court's denial of summary judgment regarding qualified immunity. *See Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016). Qualified immunity shields government officials from liability for damages for actions that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Watson v. Pearson*, 928 F.3d 507, 510 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, to defeat qualified immunity, a plaintiff must allege: (1) that the defendant violated a statutory or constitutional right and (2) that said right was clearly established at the time of the alleged violation. *See id.* A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015)).

In order to properly make out a claim under § 1983, a plaintiff must demonstrate that she has been deprived, by one acting under color of state law, of a right secured by the Constitution or Federal laws. *See* 42 U.S.C. § 1983; *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984). In general, the Sixth Circuit reviews constitutional discrimination claims alleging violation of Equal Protection under § 1983 in a similar manner as Title VII discrimination claims,

and looks at Title VII precedent in analyzing § 1983 discrimination claims. *See, e.g.*, *Weberg v. Franks*, 229 F. 3d 514, 522 (6th Cir. 2000). In a § 1983 discrimination case, the plaintiff must prove that "the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne County*, 950 F.2d 316, 324–25 (6th Cir. 1991) (quoting *Charles v. Baesler*, 910 F.2d 1349, 1356–57 (6th Cir. 1990)).

Yerkes alleges that Defendants caused her to be constructively discharged from her employment with the Patrol due to her sex and sexual orientation, by reporting her tattoo (Defendant Wyckhouse) and/or escalating the report (Defendants Kemmer, Stidham, and Smith). The district court concluded that Yerkes had been constructively discharged, which constituted an adverse employment action. The district court also determined that there was a sufficient dispute of material fact regarding whether Defendants were biased against Yerkes due to her sex and/or sexual orientation and whether they intentionally reported her for the potential tattoo policy violation due to that bias. The district court further held that despite the fact that the final decisionmakers were not demonstrated to be biased, Yerkes could "proceed against the Individual Defendants under a cat's paw theory of liability," as "[a] reasonable juror could find that the Plaintiff would not have been fired or disciplined if the Individual Defendants had not reported her and investigated her tattoo." R. 112 at PID 7259.[4] Regarding qualified immunity specifically, the district court determined that "discriminating against Plaintiff because of her sex and sexual orientation is a violation of the Fourteenth Amendment," and that "there is clearly established law

---

[4] Yerkes argues that the District Court did not use the cat's paw theory of liability to find the Individual Defendants potentially liable for her constructive discharge, but rather only used it to hold the Patrol liable under Title VII. The district court's opinion is a bit vague and confusing on this point, but it does explicitly say that Yerkes could "proceed against the *Individual Defendants* under a cat's paw theory of liability." R. 112 at PID 7259 (emphasis added). The district court seemingly applied the cat's paw theory in the traditional sense to impute the Individual Defendants' alleged bias to the patrol, as well as in reverse to hold the Individual Defendants liable for the non-biased actions of the higher-ups.

protecting female employees from arbitrary discrimination based on sex or sexual orientation for § 1983 purposes so that Defendants were 'on notice that their conduct was unlawful.'" *Id.* at 7253.

Defendants do not appear to challenge this statement, but rather allege that the district court "framed the [qualified immunity] question incorrectly." Appellants' Br. at 3–4. Defendants also do not appear to challenge the determination that Yerkes was constructively discharged, or the determination regarding the evidence of their alleged bias.[5] Defendants challenge only whether they can be held liable for reporting (and escalating the report regarding) Yerkes' policy violation where allegedly: (1) they did not have the decision-making power to constructively discharge Yerkes, (2) they did not recommend the discipline that Yerkes eventually received, and (3) Yerkes provided no evidence that the final decisionmakers regarding her discipline acted based on her sex or sexual orientation.

The district court's qualified immunity analysis contoured the right in question at too high a level of generality. *See Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015) ("The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality.'" (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, (2014))). The pertinent question is not whether the law banning discrimination on the basis of sex is clearly established, but a more nuanced one: whether reporting a potential policy violation up the chain of command with the intent to cause a fellow officer to lose their job, due to that officer's sex and/or sexual orientation, constitutes a clearly established constitutional violation. As our caselaw on this issue has gone in conflicting directions, we find that the answer to that question is no.

---

[5] Nor can they challenge this fact-based conclusion on this limited appeal. *See, e.g.*, *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

There are many cases in the Sixth Circuit which state/hold that an officer may be held liable under § 1983 for a constitutional violation even if he did not himself perform a particular action necessary to that violation. *See, e.g.*, *Harris v. Bornhorst*, 513 F.3d 503, 518–19 (6th Cir. 2008) (Prosecutor may be held liable for retaliation where she made statements to the Marine Corps leading the Corps to deny the plaintiff's application); *Paige v. Coyner*, 614 F.3d 273, 281–82 (6th Cir. 2010) (Official may be held liable for retaliation where she gave false information to the plaintiff's employer, causing the plaintiff to be terminated from her position); *King v. Zamiara*, 680 F.3d 686, 697–98, 702–03 (6th Cir. 2012) (Prison guards may be held liable for retaliation where they set in motion a chain of events leading to the plaintiff's change in security status); *Sykes v. Anderson*, 625 F.3d 294, 311–316 (6th Cir. 2010) (Police officers may be held liable for malicious prosecution where evidence demonstrated that they influenced/participated in the decision to prosecute the plaintiffs, though they did not make the final decision themselves); *Paterek v. Vill. of Armada*, 801 F.3d 630, 651 (6th Cir. 2015) (Official may be held liable for retaliation where he directed another official to commit adverse action against the plaintiffs); *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (Prison guard may be liable for retaliation where he initiated a security screen of the plaintiff, even though another official had to approve the transfer); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) (Public Defender office could be held liable for violating the plaintiff's constitutional rights where Defender's "silence about [the plaintiff's] asserted indigency made it reasonably foreseeable that he would be jailed for non-payment of his fine without having received an indigency hearing").

These cases appear to be merely specific applications of the long-accepted proposition that "[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187

11

(1961); *see also Powers*, 501 F.3d at 608 ("Traditional tort concepts of causation inform the causation inquiry on a § 1983 claim."). Thus, courts have long asked "whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct," and found that "[e]ven if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Powers*, 501 F.3d at 609; *see also King*, 680 F.3d at 695 ("[A] person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions."); *Siggers-El*, 412 F.3d at 702 ("[A] court may consider the reasonably foreseeable consequences that would follow from a retaliatory act in considering whether the plaintiff suffered an adverse action. However, a defendant would not be held responsible for consequences unless his conduct were the proximate cause of them.").

Under this theory, when Defendants reported Yerkes' potential tattoo policy violation and/or escalated said report, it was a reasonably foreseeable consequence that she could face an adverse employment action such as constructive discharge. Such a result is the natural consequence of reporting a policy violation to upper management. Defendants—taking the facts in the light most favorable to Yerkes, as we must—set in motion a chain of events that foreseeably culminated in Yerkes' constructive discharge, with discriminatory intent. *See, e.g.*, *King*, 680 F.3d at 697–98 (finding that defendant prison guard can be held liable for retaliation where she sent a letter to her superior complaining about plaintiff inmate, eventually leading to the prison increasing the inmate's security level); *Siggers-El*, 412 F.3d at 701 (finding that defendant prison guard may be held liable for retaliation where he initiated a security screen of the Plaintiff, even though

another official had to approve the transfer, concluding that "the Defendant's performance of the security screen of the Plaintiff set in motion Plaintiff's transfer").[6]

However, none of these cases are directly on point, and most are First Amendment retaliation cases. The First Amendment retaliation standard incorporates a causation requirement, *see, e.g.*, *Paige*, 614 F.3d at 281, unlike the discrimination standard, so the proximate cause analysis in retaliation cases doesn't clearly apply here. Further, there are numerous cases in this circuit—also First Amendment retaliation cases—that seem to contradict the notion that individuals who are not final decisionmakers can be held liable for the actions of the final decisionmaker, even in the retaliation context. *See Fritz v. Charter Twp. of Comstock*, 463 F. App'x 493, 500 (6th Cir. 2012) (no liability where defendant "was not in a position to terminate Plaintiff . . . and lacked authority to take adverse action against her"); *Poppy v. City of Willoughby Hills*, 96 F. App'x 292, 294–95 (6th Cir. 2004) ("Because [defendant] was not the decisionmaker, he cannot be held liable under § 1983 for the City Council's decisions regarding [the plaintiff's] terms and conditions of employment."); *Echlin v. Boland*, 111 F. App'x 415, 417 (6th Cir. 2004) ("The motivations of non-decisionmakers cannot establish a causal connection in a retaliation case."); *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001) ("[The defendant's] comments do not demonstrate a causal connection between [the plaintiff's] filing of grievances and the [adverse

---

[6] The district court referenced the "cat's paw" theory, R. 112 at PID 7258–59, which Defendants argue is inapplicable to this case. The theory states: "[I]f a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable. . . ." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). This appeal would involve twisting the cat's paw theory around, as Yerkes is not attempting to hold the Patrol liable via the discriminatory intent of the Individual Defendants, but rather to hold the Individual Defendants liable via the adverse action of the Patrol. Some Sixth Circuit cases have applied the cat's paw theory in this non-traditional manner, including in § 1983 cases. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015) (Title VII); *Paterek v. Vill. of Armada*, 801 F.3d 630 (6th Cir. 2015). But we have never explicitly adopted the reverse cat's paw theory, and the cat's paw theory—especially when used in reverse—is at its core just an application of the tort causation principles described above. Whether one terms it "reverse cat's paw" or simply "proximate causation," the results are the same, and the nomenclature is just semantics.

action] because it is uncontroverted that she was not the decisionmaker in this case."); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999) ("The defect in [the plaintiff's] claim is that neither [of the defendants] were involved in his firing, the alleged adverse action. Despite [the plaintiff's] contention that [the defendants] instigated his firing, these men did not have the ability to terminate [the plaintiff] from his commissary position.").

*Shehee* is the closest published case to this one. In that case, the plaintiff was a prisoner who worked in the commissary. 199 F.3d at 297–98. He alleged that he was harassed by his direct supervisors after refusing to participate in their kickback scheme. *Id.* He then allegedly filed a grievance against his supervisors, and was subsequently terminated from his position by upper management due to the conflict. *Id.* This Court held that his direct supervisors could not be held liable for retaliation, as, "[d]espite [plaintiff's] contention that [the supervisors] instigated his firing, these men did not have the ability to terminate [plaintiff] from his commissary position." *Id.* at 301. The logic and language of *Shehee* directly contradicts the "setting in motion" theory described above.

These cases muddy the waters. The confusion in the caselaw, and the lack of any case directly on point, makes it difficult to conclude that "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017); *see also Melton v. Phillips*, 875 F.3d 256, 268 (5th Cir. 2017) (Costa, J., concurring in the judgment) ("Such a conflict in the caselaw will support an easy defense of qualified immunity. . . . [I]t is hard to imagine that any immunity threshold should hold law enforcement to a higher standard than judges when it comes to interpreting the law."); *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019) ("The lack of 'any cases of controlling authority' or a 'consensus of cases of persuasive authority' on the constitutional question compels the conclusion that the law was not clearly

14

established at the time of the incident.") (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999));

*Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017) (concluding that a right was not clearly

established as "none of [the] cases [cited by the plaintiff] is sufficiently 'particularized' to the facts

of this case to place the supposed unconstitutionality of [the defendant's] action 'beyond debate'"

(citation omitted)). Thus, the law on this issue was not clearly established, and all four Defendants

are entitled to qualified immunity.[7]

### IV. Conclusion

The judgment of the district court denying qualified immunity to Defendants Kemmer,

Stidham, Smith, and Wyckhouse is REVERSED.

---

[7] Because we conclude that the law was not clearly established, we decline to analyze whether Defendants' actions constitute a constitutional violation, as we may under *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And because we reverse the district court and grant qualified immunity to Defendants, we decline to address their argument that the district court improperly aggregated their actions.